# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-CA-00559-SCT

*TRUSTMARK NATIONAL BANK d/b/a CREDIT
CARD CENTER*

*v.*

*ROXCO LTD.*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/02/2009 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHRISTOPHER A. SHAPLEY |
| | WILLIAM 'TREY' JONES, III |
| ATTORNEYS FOR APPELLEE: | JAMES A. BOBO |
| | PRECIOUS TYRONE MARTIN, SR. |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: REVERSED AND RENDERED. ON CROSS-APPEAL: DISMISSED - 12/08/2011 |
| MOTION FOR REHEARING FILED: | 01/05/2012; DENIED AND MODIFIED AT ¶1 AND ¶7 - 03/22/2012 |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, JUSTICE, FOR THE COURT:**

¶1. Roxco, Ltd., was hired as the general contractor for several public-construction projects for the State of Mississippi, including four building projects at the University of Mississippi, Jackson State University, and Alcorn State University. State law requires that a certain percentage of the cost of construction be retained to ensure completion. However, Mississippi Code Section 31-5-15 (Rev. 2010) allows the contractor to access that retainage

by depositing with the State other acceptable security. Pursuant to Section 31-5-15, in order to access the retainage on its state-construction projects, Roxco substituted securities valued at $1,055,000. These securities were deposited in a safekeeping account at Trustmark National Bank. Upon being notified of Roxco's default, the State instructed Trustmark to transfer the funds from the treasury bills into the state treasury account. By letter, Roxco directed Trustmark not to transfer the funds from the treasury bills to the State's account. Notwithstanding Roxco's letter, Trustmark deposited the funds into the State's account. Roxco filed suit against Trustmark for breach of contract and conversion in Hinds County Circuit Court. Trustmark argued that Section 31-5-15 permitted the release of the funds in the safekeeping account. A jury found in favor of Roxco and awarded $3,720,000 in damages. Aggrieved, Trustmark filed this appeal.[1] Finding that the trial court should have granted the motion for judgment notwithstanding the verdict, we reverse and render.

### FACTS AND PROCEDURAL HISTORY

¶2. Roxco is a former[2] construction company, owned and operated by Benjamin Turnage, that contracted with the State to perform various public-construction projects throughout the State. In 1994, Roxco hired David Carter, a former employee of Trustmark, to act as its chief financial officer. Based on Carter's recommendation, on April 26, 1996, Roxco opened a safekeeping account at Trustmark. The safekeeping account was opened to purchase and

---

[1]Roxco filed a cross-appeal with this Court regarding the trial court's denial of Roxco's motion to reconsider ruling on punitive damages and Roxco's motion for attorneys' fees, costs, and expenses. In response, Trustmark filed a motion to dismiss Roxco's cross-appeal. Based on the Court's disposition in the case, the cross-appeal and motion to dismiss are now dismissed as moot.

[2]Roxco no longer works within the construction industry.

2

hold treasury bills. The agreement governing the safekeeping account clearly stated that the "Bank will follow the specific written instruction of the depositor." During his employment, Carter was authorized to interact with Trustmark concerning Roxco's safekeeping account.

¶3. Throughout the next four years (1994-1998), Roxco was hired as the general contractor for numerous public-construction projects for the State, including four building projects at the University of Mississippi, Jackson State University, and Alcorn State University. During construction, Roxco attempted to substitute securities (certificates of deposit/treasury bills) pursuant to Mississippi Code Section 31-5-15, in lieu of the retainage being withheld by the State.

¶4. To effect this substitution of securities in lieu of the retainage, by letter dated April 11, 1996, Roxco authorized Trustmark to accept for safekeeping a United States Treasury bill and directed that the safekeeping receipt be sent to the State Treasurer's Office. During the next several years, many similar and related documents were exchanged among Roxco, the Bureau of Buildings within the State Department of Finance and Administration, and Trustmark for this same purpose. With each transaction, Trustmark entered on its books, and on the face of each treasury bill, that the securities were pledged to the State. Trustmark generated and provided, to both Roxco and the State, written safekeeping receipts reflecting that the treasury bills were pledged to the State. It provided to the parties a monthly report of the safekeeping account, which reflected the specific treasury bills pledged to the State in lieu of retainage for specific contracts, information on the substitution of additional collateral when new contracts were secured, and the specific treasury bills purchased as replacements for matured treasury bills.

3

¶5. Early in 1998, Roxco began having a dispute with its bond company, American Home Assurance Company. In October 1998, in a step towards resolution, Roxco agreed to write letters of default, to be held in trust by American Home Assurance Company, as a condition of receiving a $2,000,000 credit line. Only one month later, in November 1998, Roxco's bond company mailed the default letters to the State. The State received the default letters, which were on Roxco's company letterhead and signed by its president, informing it that Roxco "is in default" and that Roxco "irrevocably and voluntarily abandons and terminates" the four projects at the public universities. The State accepted the letters as Roxco's voluntary default on the projects. At trial, Roxco claimed that the default letters were sent by its bond company and were "bogus." However, in November 1998, Roxco ceased work on all of the state construction projects.

¶6. On April 9, 1999, the Bureau wrote then-State Treasurer Marshall Bennett and asked that he notify Trustmark of Roxco's default and the need for the $1,055,000, the amount pledged in lieu of retainage, to be deposited into the State's account. On April 12, 1999, Bennett forwarded the letter and the written receipts for the funds at issue to Trustmark and directed Trustmark to deposit the funds into the State's account to be used to complete the four projects.

¶7. On April 14, 1999, after learning that State was attempting to collect the funds, Steve Williams, attorney for Roxco, notified Trustmark that the funds at issue were subject to a security agreement between Roxco and First Tennessee Bank and objected to the release of the funds to anyone other than First Tennessee Bank or Roxco.

¶8. On April 21, 1999, Trustmark officials met with State officials, including Bennett, and

4

were provided copies of the default letters, which were signed by Roxco and stated unequivocally that Roxco had irrevocably and voluntarily defaulted and abandoned the contracts. Trustmark complied with the State's request and deposited the funds into the State's account.

¶9. On April 2, 2002, Roxco filed suit against Trustmark in Hinds County Circuit Court for breach of contract, conversion, negligence, breach of duty of good faith and fair dealing, and breach of a fiduciary relationship. A jury found in favor of Roxco and awarded $3,720,000 in damages.

## DISCUSSION

¶10. Trustmark raises the following issues on appeal: (1) Whether the trial judge erred in failing to grant Trustmark's motions for directed verdict and judgment notwithstanding the verdict; (2) whether the trial judge erred in failing to grant Trustmark a new trial, given the overwhelming evidence contrary to the jury's verdict; (3) whether the trial judge granted erroneous jury instructions; (4) whether Trustmark should be granted a new trial because the trial judge allowed inadmissible evidence and excluded admissible evidence; (5) whether the trial judge erred in failing to grant Trustmark's request for a setoff against the jury verdict from Roxco's prior recovery in the settlement of the suit against the bonding company; and (6) whether the trial judge committed reversible error in failing to grant Trustmark's request for a remittitur.

### 1. Directed Verdict and Judgment Notwithstanding the Verdict

¶11. Trustmark's first issue can be resolved by determining whether Mississippi Code Section 31-5-15 permitted Trustmark to release the funds in the safekeeping account to the

5

State. If Section 31-5-15 permitted the release of funds to the State, Trustmark cannot held be liable for breach of contract or conversion.

¶12.    Mississippi Code Section 31-5-15 states:

> Under any public contract heretofore or hereafter made or awarded by the State of Mississippi, or any agency or department of the State of Mississippi, or by any political subdivision thereof, the contractor may, with the written consent of his or its surety, from time to time, withdraw the whole or any portion of the amount retained from payments due the contractor pursuant to the terms of the contract by depositing with the State Treasurer of the State of Mississippi, or the treasurer or secretary of the political subdivision of the State of Mississippi holding funds belonging to the contractor, the following security, or any combination thereof in an amount equal to or in excess of the amount so withdrawn, said securities to be accepted at the time of deposit at market value but not in excess of par value, to wit:
>
> > (1) U.S. Treasury Bonds, U.S. Treasury Notes, U.S. Treasury Certificates of Indebtedness, or U.S. Treasury Bills, or
> >
> > (2) Bonds or notes of the State of Mississippi, or
> >
> > (3) Bonds of any political subdivision of the State of Mississippi, or
> >
> > (4) Certificates of deposit issued by commercial banks located in the State of Mississippi, provided that such certificate is negotiable or is accompanied by a power of attorney executed by the owner of the certificate in favor of the Treasurer of the State of Mississippi or of the treasurer or the secretary of the political subdivision involved, or
> >
> > (5) Certificates of deposit issued by savings and loan associations located in the State of Mississippi, the accounts of which are insured by the Federal Savings and Loan Insurance Corporation, or whose accounts are insured by a company approved by the State Board of Savings and Loan Associations, provided that such certificate is made payable with accrued interest on demand and is accompanied by a power of attorney executed by the owner of the certificate in favor of the Treasurer of the State of Mississippi or the treasurer or secretary of the political subdivision involved, and provided that any such certificate from any of the savings and loan associations referred to in this subparagraph shall not be for an amount in excess of the maximum dollar amount of coverage of the Federal Savings and Loan Insurance

6

Corporation.

The agency or department of the state shall notify the State Treasurer of the amount of deposit required and shall also notify the State Treasurer when to release the deposit. The political subdivision of the state shall notify its treasurer or secretary of the amount of deposit required and shall also notify him when to release the deposit.

The State Treasurer, or the secretary or treasurer of the political subdivision holding said security, shall, from time to time, collect all interest or income on the security so deposited and shall, by and with the written consent of contractor's surety, pay the same when and as collected to the contractor or contractors who deposited said obligations. If the deposit be in the form of coupon bonds, the coupons as they respectively become due shall be delivered to the contractor.

If in the event of an overpayment to a contractor the contracting authority is unable to obtain reimbursement for such overpayments from the contractor, the chief administrative officer of the contracting authority shall notify the contractor, its surety and the State Treasurer or other holder of the security, of the nature of the overpayment and of the failure to obtain reimbursement. Upon such notification, the security holder shall retain the income on the deposited security until an amount equal to the overpayment is accumulated and paid to the contracting authority.

In the event the contractor shall default in the performance of the contract or any portion thereof, the securities deposited by him in lieu of retainage and all interest and coupons and income accruing on said securities after said default may be sold by the state or any agency or department thereof, or any political subdivision, and the proceeds of said sale used as if such proceeds represented the retainage provided for under the contract.

Miss. Code Ann. § 31-5-15 (Rev. 2010).

¶13.   This appeal concerns the interpretation of a statute, which is a question of law that we review de novo. *Finn v. State*, 978 So. 2d 1270, 1272 (¶ 6) (Miss. 2008).  This Court has stated the following rule regarding the interpretation of a statute:

We will not engage in statutory interpretation if a statute is plain and unambiguous. However, statutory interpretation is appropriate if a statute is ambiguous or is silent on a specific issue. In either case, the ultimate goal of

7

this Court is to discern the legislative intent. The best evidence of legislative intent is the text of the statute; the Court may also look to the statute's historical background, purpose, and objectives. If a statute is ambiguous, it is this Court's duty to carefully review statutory language and apply its most reasonable interpretation and meaning to the facts of a particular case.

*Buffington v. Miss. State Tax Comm'n*, 43 So. 3d 450, 454 (¶13) (Miss. 2010) (citation omitted).

¶14.    Roxco argued, and the trial court agreed, that Section 31-5-15 did not apply to the contract between Trustmark and Roxco. Roxco argued that the requirements of the statute were not met for the State to take control of the securities. Roxco argued that no securities were deposited with the State Treasurer and that Roxco did not default on the construction projects. In order to effectuate Section 31-5-15, the State Treasurer does maintain some securities in his vault. However, the majority of these securities are maintained by commercial-banking institutions, with whom the State has entered into service contracts to provide safekeeping accounts. The safekeeping accounts allow the banks to hold securities on behalf of the State. A contractor may then select a bank, authorized to hold securities on behalf of the State, in which to open a safekeeping account.

¶15.    Trustmark argues that its performance was consistent with Roxco's understanding and expectations with respect to the funds in the safekeeping account. This was consistent with testimony from Roxco personnel. Roxco's former Chief Financial Officer Carter, who signed the safekeeping-account agreement, testified that, while acting in his authorized capacity for Roxco, he pledged the funds in the safekeeping account to the State under Section 31-5-15. Carter further testified that it was his understanding that, once the funds were pledged, Roxco forfeited the right to have the funds back without the State's

permission. Carter's successor as Roxco's Chief Financial Officer, H.G. Morgan, provided the same testimony.

¶16. The language of Section 31-5-15 is clear and unambiguous, and our rules of statutory construction insist that the best evidence of the Legislature's intent is the text of the statute. The Legislature enacted Section 31-5-15, which specifies the procedure a contractor must use to substitute securities in lieu of retainage fees being withheld on a government contract. To obtain a release of the retainage, the statute requires a contractor to ***deposit funds with the State Treasurer***, or to deposit a certificate of deposit issued by a commercial bank, ***provided that the certificate is negotiable or accompanied by a power of attorney executed by the owner of the certificate in favor of the Treasurer of the State***.

¶17. In this case, the deposit requirements of Section 31-5-15 were met. It is true that the treasury bills were not physically delivered to the state treasurer himself. However, under the State's agreement with Trustmark to serve as a safekeeper of securities, Trustmark became the agent of the State. Under general principles of agency law, delivery to the agent is delivery to the principle. But additionally, Roxco gave written instructions to Trustmark pledging these securities to the State of Mississippi pursuant to Section 31-5-15. Roxco having done so, Trustmark entered a notation on the securities, specifying that they were pledged to the State of Mississippi.[3]

¶18. The term "pledged" has several definitions, among them, "delivery of goods or

---

[3] Once pledged, the following language was entered on the face of the treasury bill:
PLEDGED TO:
TREASURER, STATE OF MISSISSIPPI FOR THE BUREAU OF BUILDINGS, GROUNDS AND REAL PROPERTY MANAGEMENT.

9

personal property as security for a debt or obligation." *American Heritage Dictionary* 1956 (3d ed. 1992). "Pledged" also has been defined as "a bailment or delivery of goods or property by way of security for a debt or engagement, or as security for the performance of an act." *Black's Law Dictionary* 1153 (6th ed. 1990). The meanings of "deposit" include: "The giving of the possession of personal property by one person to another, with his consent to keep for the use, benefit, and safekeeping of the first or of a third person." *Black's Law Dictionary* 438 (6th ed. 1990).

¶19. Under these definitions and the facts of this case, the formal pledging of the treasury bills to the State of Mississippi was effective as delivery and compliance with Section 31-5-15. Having obtained effective delivery of the securities, upon default, the State of Mississippi was authorized to receive those funds substituted for the retainage.

¶20. Roxco argues that, contrary to its orders, Trustmark released the pledged funds to the State of Mississippi and is therefore indebted to it. However, once Roxco pledged and effectively delivered those funds to the State, it lost control of them and could take no action to control them without the permission of the State.

¶21. Accordingly, the trial judge improperly denied Trustmark's motions for a directed verdict and judgment notwithstanding the verdict. Because we find dispositive error here, all other issues are moot.

**CONCLUSION**

¶22. Based on this discussion, we reverse and render the judgment of the trial court.

¶23. **ON DIRECT APPEAL: REVERSED AND RENDERED. ON CROSS-APPEAL: DISMISSED.**

10

**WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, LAMAR, KITCHENS AND CHANDLER, JJ., CONCUR. PIERCE, J., NOT PARTICIPATING.**